UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DYMPNA D. MCMANUS, )<br>)<br>Petitioner )<br>)<br>v. )<br>)<br>)<br>PETER J. MCMANUS )<br>)<br>Respondent. ) | CIVIL ACTION<br>No. 04-10752 GAO |

# POST-TRIAL BRIEF OF DYMPNA D. MCMANUS

## INTRODUCTION

Petitioner Dympna D. McManus ("Ms. McManus"), a resident of Northern Ireland, initiated this action to obtain the return of her four children to her in their home of Northern Ireland after their father, Respondent Peter McManus ("Respondent"), decided unilaterally to keep the children in the United States while they were on vacation here in the summer of 2003. To secure this relief, Ms. McManus has invoked the authority of the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention"), a multilateral treaty in force in Northern Ireland and enacted by federal statute in this country. The Hague Convention discourages transnational parental kidnapping by requiring courts in contracting states to order the immediate return

1

of any child who is adjudged to have been unlawfully abducted or retained in another country back to their place of habitual residence. The facts developed at the two-day bench trial in this case demonstrate unequivocally that return is required; Respondent effectively removed the McManus Children from their place of habitual residence in direct breach of the custodial rights exercised by Ms. McManus under the law of Northern Ireland.

Although the Hague Convention recognizes certain limited defenses to the presumptive rule of return, three of which have been invoked by Respondent, Respondent was not able to satisfy his evidentiary burden as to any of one of them. First, the Respondent's assertion that Ms. McManus consented or acquiesced to the retention of her children in the United States is both unsupported and directly contrary to Ms. McManus's pro-active action to seek the return of her children. Second, the risk of harm Respondent alleges would be occasioned by the children's repatriation to Northern Ireland is inconclusive and not the type recognized as sufficiently serious under the Convention. Finally, the claimed objections by the McManus Children to return were inconsistent and reflective of their mere preferences.

For these reasons, an order of return is appropriate and due.

## STATEMENT OF FACTS

### The McManus Marriage

Ms. McManus, one of 11 children, grew up on a farm in Irvinestown, Northern Ireland. (Transcript of Bench Trial, Day Two, September 23, 2004, ("Tr.

2") at p. 5) In 1986, Ms. McManus traveled to the United States where she met the Respondent in a bar at Kenmore Square in the Commonwealth of Massachusetts. (Id., at p. 11) Two years later, on February 22, 1988, Ms. McManus married Respondent in Boston, Massachusetts. The two were also married in a religious ceremony in Enniskillen, Northern Ireland, three miles from Ms. McManus's home town of Irvinestown, the following year, on July 9, 1989. (Id., at p.8; Exhibits ("Exh.") 6 and 7).

The married couple initially resided in Dorchester, Massachusetts. During their marriage, they had four children: twins Daniel McManus ("Daniel") and Sean McManus ("Sean"), born on July 31, 1990; Stephanie McManus ("Stephanie"), born on December 12, 1991; and Peter J. McManus ("Peter Og"[1]), born on May 19, 1993. (Id., at Exhs. 8, 9, 10, and 11). The four children (the "McManus Children"), now 14, 12, and 11 respectively, were all born in the Commonwealth and are citizens of the United States. (Id.)

For the first several years, the McManus marriage was a happy one. (Id., at p. 11) This changed beginning in the mid-1990s. About the time when Ms. McManus was expecting Peter Og, Respondent started coming home from work late at night and refusing to explain his whereabouts to Ms. McManus. Respondent also became physically abusive towards Ms. McManus when she questioned him about his whereabouts. During one incident, Respondent hit a pregnant Ms. McManus with an object over the back, causing Ms. McManus to be hospitalized for bleeding.

---

[1] "Og" is an Irish nickname indicating youthfulness and denotes Peter's status as the youngest child in the McManus family.

On another occasion, Respondent hit Ms. McManus when she demanded to know where he had been missing from the home for a couple of days. (Id., at pp. 11-13)

The relationship between Ms. McManus and Respondent continued to worsen. Communication between the two did not occur. Although they shared the same house, the couple maintained separate lives; Respondent worked long hours at a car dealership and Ms. McManus raised the McManus Children. The couple no longer lived as husband and wife. They slept in different beds on separate floors and ceased having any sexual relations. (Id., at p. 14) Respondent would disappear from the home for extended periods of time and, during one such disappearance, liquidated and spent the children's Fidelity funds. (Id., at pp. 13, 29)

The McManus Family Move to Northern Ireland

In 2001, the McManus family decided to leave the United States and permanently relocate to Enniskillen, Northern Ireland. The reasons for the relocation were manifold: 1) the education system for the children was superior to and less expensive than that available in the United States; 2) Ms. McManus, whose siblings and mother all lived in or near Enniskillen, would have a large support system to help raise the children; and 3) Ms. McManus could be close to her ailing mother. (Id., at p. 16)

The family was already familiar with Northern Ireland, having traveled there for lengthy visits with Ms. McManus's family since 1999. Respondent had even spoken with Ms. McManus's sisters about the Northern Irish schools during such visits. (Id.)

In preparation for the move, the McManus family sold their Dorcheter home and two cars, shipped their personal belongings to Enniskillen, and purchased one-way tickets to Northern Ireland. Respondent quit his job. Ms. McManus informed people that the family would be leaving and collected the children's school, baptismal, and medical records. They departed the United States for Northern Ireland in May of 2001. (Id., at pp. 16, 17)

Upon arrival, the family moved in with Ms. McManus's mother at the family farm in Irvinestown until they found a house to rent in Enniskillen in the County of Fermanagh. The house, in which Ms. McManus still resides, is a single-family two story house located in the Enniskillen countryside with a backyard ample enough for the boys to play sports and views of Lake Erne. (Id., at pp. 7-8; Exh. 5) Shortly after their move into the home, the family took in a family cat, "Kitty-Mitty," who they had gotten from the McManus family farm. (Id., at p. 18) They also purchased a car, and obtained government health insurance. (Id., at pp. 52, 131, 133-134)

The children soon settled into life in Northern Ireland. For the 2001-2002, school year, all four children attended Holy Trinity primary school. (Id., at pp. 18-19; Exhs. 12, 13, 14, and 15) In September of 2002, the twins were accepted into and did attend school at St. Michael's College, a grammar school that is the equivalent of a U.S. high school. (Id., at p. 19; Exhs. 12, 13) During these two years, the twins played on numerous school and community soccer ("Gaelic football") teams, including the Enniskillen Gaels and the Enniskillen Town Colts. (Id., at pp. 25, 62; Exh. 20) Both received sports medals, the most noteworthy being Daniel's

award for athlete of the year from St. Michael's College. (Id., at p. 26) Stephanie and Peter Og also began playing soccer in the Spring of 2003. (Id., at pp. 25-26)

In addition to their schooling and sports playing, the McManus children were active in their local Catholic church, St. Michael's. The three oldest children spent six months to a year preparing for their Confirmations, which they received in 2002 and 2003. Peter Og spent an equal amount of time working towards Communion, which he received in 2002. (Id., at pp. 22-25; Exhs. 16, 17, 18, and 19)

Respondent's Return to the United States

Shortly before Christmas in 2001, Respondent left Northern Ireland to return alone to the United States. Respondent had planned but had not discussed his intent to leave the family with Ms. McManus. She only discovered his plan upon finding Respondent's one-way ticket to the United States. Respondent returned to Northern Ireland on 3 occasions, Christmas in 2002 and the children's Confirmations. (Id., at pp. 27-28, 34) Although Respondent sent Ms. McManus monthly checks, the checks were not enough to support the family. Therefore, Ms. McManus was forced to apply for public assistance from the Government of Northern Ireland. (Id., at pp. 33-34) Respondent came to depend upon the governmental assistance to supplement his financial support. (Id., at 132)

Around the time Respondent left Northern Ireland, the McManus children began displaying disciplinary problems. Ms. McManus struggled to get the children, the boys in particular, to go to school, do their homework, and go to bed at night. When pressed to do these things, the boys acted out physically, including

6

locking themselves behind doors and throwing stones at the windows of both the McManus home and next-door neighbor's house. (Id., at pp. 30-32)

In Respondent's absence, Ms. McManus occasionally called upon neighbors and her twin brother Liam for help in managing the children. On one such occasion, she asked a neighbor known as "Graham" to help get Sean and Peter Og off to school after the boys had blocked their bedroom door with a bed to avoid going to school. Graham forced the door open, physically disciplined Sean, and instructed both boys to get ready for school. Ms. McManus's neighbor, "Ann," would also "chat" with and "calm" down Daniel and Sean at various times. Finally, Ms. McManus also employed the help of Liam. On one occasion only, Liam physically disciplined one of the children – Daniel – who was admittedly "acting up" and "not listening to" his mother. (Id., at pp. 30-33, 63)

During this time, Ms. McManus would drink on average two to three beers after she put the children to bed. She would have these beers with dinner or while watching a program on television. (Id., at p. 41)

The McManus Children's Vacation in the United States in July 2003

In 2003, Ms. McManus agreed to let the McManus Children visit with the Respondent in the United States for three weeks. Round-trip plane tickets were purchased for the four with a departure date of July 2, 2003 and a return date of July 24, 2004. (Id., at pp. 34-35) On July 21, 2003, three days prior to the children's scheduled return to Northern Ireland, Respondent left a telephone message on Ms. McManus's answering machine instructing Ms. McManus not to go

7

to the airport and that the children would be living with the Respondent in the United States from that point forward. (Id., at p. 36; Exh. 21) Respondent then left a subsequent message two days later reminding Ms. McManus not to go the airport. (Id.) Even though Ms. McManus did not telephone Respondent about his decision,[2] at no time before or after these phone calls from Respondent did Ms. McManus ever consent to her children being kept in the United States. (Id., at pp. 55-56)

Approximately two weeks after the receiving the news that her children would not be returning to her, Ms. McManus began to explore her legal options. She eventually found an attorney, Dara Montague, who informed her of the Hague Convention and that she could apply with legal authorities in Northern Ireland and the United States for the return of her children. An application was filed with the Central Authority of Northern Ireland, the Lord's Chancellor's Office, on October 3, 2003 seeking that very relief. (Id., at pp. 38-39; Exh. 22) Ms. McManus understood that the application would set into motion a process whereby a court action in the United States would be filed on her behalf to get her children back. (Id. at p. 40, 56)

After she invoked the Hague process, Ms. McManus did not travel to United States. The reasons were very simple: 1) she did not know initially where her children were residing because she was not in contact with the Respondent and the children appeared to be moving between different locations; and 2) she was waiting

---

[2] This fact is not unusual given that Ms. McManus and Respondent did not communicate well or regularly before this time. Ms. McManus also testified that she did not feel comfortable calling him at work because Respondent's co-workers would, in her words, "make fun of me and tell me he was with his girlfriend." (Tr. 2, at p. 55)

8

for a lawsuit to be filed in the United States. (Id., at pp. 39-40, 56) On or about April 14, 2004, this action was filed on Ms. McManus's behalf.

Respondent's State Family Court Action

In conjunction with his unilateral decision to retain the McManus Children in the United States, Respondent filed for and obtained temporary custody of the McManus Children in a Massachusetts Probate and Family Court action Respondent had earlier initiated to obtain a divorce from Ms. McManus. Ms. McManus objected specifically and moved to vacate the "Judgment of Divorce Nisi" issued in December of 2001 that was to take effect on March 15, 2004. In her affidavit filed in support of the motion to vacate, Ms. McManus argued that the temporary custody awarded as part of the judgment was obtained on erroneous facts. (Id., at pp. 56-57; Exh. 23)

## **LEGAL STANDARD**

Both the United States and Northern Ireland are contracting parties to the Hague Convention, done at the Hague on October 25, 1980. See T.I.A.S. No. 11670 at 1, 22514 U.N.T.S. at 98, reprinted in 51 Fed. Reg. 10494; U.S. Dept. of Justice, Juvenile Justice Bulletin (Dec. 2001) (listing the 50 Hague Convention countries). The Hague Convention is implemented in the United States by a federal statute known as the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. 11601 et seq. and is designed to deter abduction and retention of children across international borders. To effect this goal, the Convention obligates judicial

9

authorities in contracting states to order the return of a child adjudged to have been wrongly removed or retained to her original country of residence provided that the petition seeking the return is filed within one year of the removal or retention and the child sought to be returned is under 16 years of age. See Hague Convention, at Articles 4 and 12.[3]

A removal or retention is wrongful where "it is in *breach of rights of custody attributed to a person* . . . , either jointly or alone, under the law of the State in which the child was *habitually resident* immediately before the removal or retention" and "at the time the removal or retention *those rights were actually exercised*, either jointly or alone." Hague Convention, Art. 3 (emphasis supplied). The rights of custody may arise by: 1) operation of law; 2) judicial or administrative decision; or 3) agreement having legal effect under the law of the State in which the child was habitually residing. Id. The petitioner bears the burden of establishing the wrongful removal or retention and must do so by a preponderance of the evidence. See ICARA, 42 U.S.C. 11603(e)(1)(A).

If the petitioner establishes the wrongfulness of the removal or retention, then the court shall order a child's return unless one of the narrow exceptions

---

[3] Art. 12 provides in relevant part:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

Art. 12 only applies to children younger than 16 years of age. See Hague Convention, Art. 4 ("The Convention shall cease to apply when the child attains the age of 16 years.")

enumerated under Article 13 of the Convention applies. Id. at 42 U.S.C. 11601(a)(4).

It is anticipated that Respondent will invoke three Article 13 exceptions: 1) consent to or subsequent acquiescence in the removal or retention; 2) grave risk that the child will be exposed to physical or psychological harm or be put in an intolerable situation if she is returned; and 3) the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take into account that child's views. The Respondent must prove exceptions (1) and (3) by a preponderance of the evidence and exception (2) by clear and convincing evidence. See ICARA, 42 U.S.C. 11603(e)(2)(A) and (B).

Even if the Respondent satisfies his requisite evidentiary burden, the Court retains discretion as to whether it will return the child to her place of habitual residence. See Hague Convention, Art. 13 (stating merely that the judicial authority "is not bound to order the return of the child" if the person opposing the return establishes an exception).

In weighing the evidence, the Court is limited to determining the rights under the Convention, not the merits of any underlying child custody claims. See ICARA, 42 U.S.C. 11601(b)(4).

## ARGUMENT

I. **Ms. McManus Has Proved By a Preponderance of the Evidence That The Conditions Precedent For An Order of Return Have Been Satisfied.**

This Court must order the return of the McManus Children to Northern

Ireland if Ms. McManus proves that: 1) the McManus Children were "habitually resident" in Northern Ireland immediately prior to Respondent's retention of them in the United States; and 2) Respondent's retention was in breach of Ms. McManus's custody rights that she was exercising prior to the retention. See Hague Convention, Arts. 3, 12. The evidence presented at trial demonstrates that Ms. McManus has proved these elements by a preponderance of the evidence.

### A.    The McManus Children Were Habitually Residing in Northern Ireland.

Neither the Hague Convention nor ICARA define what it is to be "habitually resident" in a country. This Court has adopted the definition supplied by the Third Circuit Court of Appeals in Feder v. Evans-Feder, 63 F.3d 217 (3rd Cir. 1995). See Hasan v. Hasan, 2004 WL 57073, *2, fn.2 (D. Mass. 2004); Zuker v. Andrews, 2 F. Supp.2d 134, 136-37 (D. Mass. 1998). According to Feder, the term "habitual residence" denotes the place: 1) where a child "has been physically present for an amount of time sufficient for acclimatization;" and 2) which has a degree of settled purpose from the child's perspective." 63 F.3d at 224.

In satisfying the physical presence prong of the habitual residence inquiry, a child need not be in a country for an extended period of time. Indeed, this element is dependent upon how quickly a child becomes acclimated or settled in a particular environment. Factors demonstrating that this process has occurred include attendance at school and other social institutions, formation of social ties with

friends and family, and participation in community activities. See Gonzalez v. Nazor Lurashi, 2004 WL 1202729, *8 (D. Puerto Rico).

Some circumstances will actually facilitate a child's connection to a particular place. For example, "[w]hen the child moves to a new country accompanied by both parents, who take steps to set up a regular household together, the period [of physical presence in the country] need not be long." Mozes v. Mozes, 239 F.3d 1067, 1078 (9th Cir. 2001), citing to Feder, supra (six months); Harsacky, 930 S.W.2d 410 (Ct. App. Ky. 1996) (four months); Brooke v. Willis, 907 F. Supp. 57 (S.D.N.Y. 1995) (2 months). This is particularly true where a child has no clearly established habitual residence elsewhere. See Mozes, 239 F.3d at 1082 (where child has no alternative residence, child may become habitually resident even in a place where she was intended to live for only a limited period of time.")

In analyzing the "settled purpose" prong, the courts consider both the "child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." Feder, 63 F.3d at 224. The requisite parental intent will generally be found where the family as a unit has relocated to another country under circumstances suggesting that they intend to make their home there. See Mozes, 239 F.3d at 1076-77, citing to Feder and numerous other federal court decisions. In such circumstance, the intent exists irrespective of whether one of the parents has reservations about the permanency of the move. See id. at 1077 ("When courts find that a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another, they are generally

unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose."); Harsacky, 930 S.W.2d at 412 (holding that lease of house and sale of personal property in Finaland and shipment of personal effects to United States demonstrated that the parties "intended to relocate to the United States on an indefinite basis, if not permanently.")

In this case, the McManus family sold their house and two cars, shipped their furniture and other personal belongings to Northern Ireland, removed the McManus Children from Massachusetts schools, collected the medical, school, and other records of the McManus Children, and purchased one-way tickets to Northern Ireland. In addition, Mr. McManus, the family's breadwinner, was no longer working at the time the family left for Northern Ireland.

Upon arrival in Northern Ireland, the family, among other things, moved into a home for which they purchased furniture and other items, purchased a car and car insurance, enrolled the children in school, opened a checking account, re-established ties with their extended maternal family, and acquired a family pet. Respondent even obtained a card entitling him to national health insurance. At the time the McManus Children were retained by Respondent in the United States approximately 2 years later, the McManus Children had regularly attended school for two years, become actively involved in sports and their local church, and developed close friends. These facts unequivocally infer the McManus family's intent to abandon their home in the United States for a new life in Northern Ireland.

Consistent with the objective facts surrounding the move, Ms. McManus believed that it was permanent. She testified that the move was motivated by a desire to be close to her ailing mother, to educate the McManus Children in a superior and less expensive school system, and to benefit from an extended support system that her large family could offer. Although he admitted that the family moved so that Ms. McManus could be closer to her mother, Respondent insisted that the relocation was meant to last for a mere 6 to 8 months. (Tr. 2, at pp. 112, 123) His claim that the residence was temporary is not credible given that nothing remained in the United States for the McManus family – no home, no cars, no personal belongings, and no job – and that significant resources had been invested in recreating a new home in Northern Ireland. Respondent even testified that he only had $10,000 left when he left the family to return to the United States, hardly a sufficient sum to sustain another major move of the family back to the United States. (Id. at p. 132)

In addition to the above, it is significant that Respondent did not ask Ms. McManus or his children to return to the United States with him when he left Northern Ireland 6 months after their arrival and, indeed, consented to them remaining in Ms. McManus's native country while he lived and worked in the United States for the next one and one-half years. He testified that it was better for the family if he left Northern Ireland because he "agitated" Ms. McManus and later satisfied himself that the family was getting along fine without him. (Id. at pp. 113-115, 121, 124) Respondent even came to depend upon the income payments

provided by the Government of the United Kingdom as a means of adequately providing for his children. (Id. at p. 132) Given his obvious acceptance of this arrangement, Respondent cannot reasonably contest that Northern Ireland became the children's place of habitual residence. See Mozes, 239 F.3d at 1082 ("It is entirely natural and foreseeable that, if a child goes to live with a parent in that parent's native land on an open-ended basis, the child will soon begin to lose its habitual ties to any prior residence. A parent who agrees to such arrangement without any clear limitations may well be held to have accepted this eventuality.")

Even assuming *arguendo* that Respondent did not intend or agree to Northern Ireland as the family's new home, his reluctance to establishing the new residence will not defeat a finding of a settled purpose in Northern Ireland. Respondent's claimed attitude towards the move to Northern Ireland is similar to that of the respondent in the Feder case.

In Feder, a married couple agreed to move with their child from the United States to Australia after the father had secured a job in that country. The child had been born in and spent the majority of his life in the United States prior to the move. The mother, the respondent, was ambivalent about the relocation given the couple's ongoing marital problems. Notwithstanding her attitude, the Feders put their American house on the market and shipped all their furniture to Australia. They then began to establish a new life in Australia which included purchasing and renovating a new home, putting their child into school, and enrolling in the Australian health care system. Within six months of moving, the mother took the

child on an ostensible visit to the United States. She and the child, however, remained in the United States, where the mother filed for divorce.

On the father's petition for an order to return the child to Australia, the Third Circuit Court of Appeals held that the child's habitual residence had become Australia irrespective of the mother's own personal vacillating preferences. The court stated, "That Mrs. Feder did not intend to remain in Australia permanently and believed that she would leave if her marriage did not improve does not void the couple's settled purpose to live as a family in the place where Mr. Feder had found work." Feder, 63 F.3d at 224. Such a finding was warranted, the court held, because it properly focused the habitual residence inquiry on the child's circumstances "immediately preceding" his removal to the United States rather than on the mother and her intent to leave Australia if the marriage fell apart. See id.

Like the mother in Feder, Respondent may have been unclear about the permanency of the move to the new country. However, also like Ms. Feder, Respondent pursued a clear course of action to establish a new residence. Respondent even went further than Ms. Feder in that he allowed his children to continue to establish their lives in Northern Ireland even after he had decided to leave the country. Following the ruling in Feder, habitual residence in Northern Ireland must be found here despite Respondent's alleged intentions. To find otherwise would elevate improperly Respondent's changing preferences over that of

the circumstances of the McManus Children's lives in Northern Ireland immediately preceding their retention in the United States.[4]

### B. Ms. McManus Had Custody Rights Of The McManus Children By Operation of the Law of Northern Ireland That She Was Exercising Immediately Before Respondent's Retention of the Children On July 21, 2003.

Ms. McManus's custody rights are defined by the law of Northern Ireland, the place of habitual residence prior to Respondent's retention of the McManus Children in the United States. See Hague Convention, Art. 3; see also Whallon v. Lynn, 230 F.3d 450, 456 (1st Cir. 2000) (applying the custody law of Mexico as the place of habitual residence prior to the unlawful removal). Civil Code No. 755 (N.I. 2), The Children (Northern Ireland) Order 1995, Section 5 provides that a mother and father shall each have "parental responsibility" for a child if they were married at the time of the child's birth. (Transcript of Bench Trial, Day One, September 22, 2004, ("Tr. 1") at Exh. 1)[5] Parental responsibility is defined broadly as "all the rights, duties, powers, responsibilities and authority which by law a parent of a child has in relation to the child and his property." Id. at Section 6.

Because the McManus Children were born during the marriage of Ms. McManus and Respondent, Ms. McManus has *de jure* custody over the McManus

---

[4] In determining what a child's circumstances are for purposes of locating her habitual residence, the focus is on the period of time "immediately preceding" the retention, not on the child's entire life. See Feder, 63 F.3d at 224 (criticizing federal district court for emphasizing that majority of child's life was spent in the United States, and ignoring the 6 months child lived in Australia "immediately preceding" his removal to the United States as well as the circumstances of his life in Australia). Therefore, the fact that the McManus Children have spent most of their lives in the United States does not defeat a finding of habitual residence in Northern Ireland if they were settled in Northern Ireland for the two years prior to their retention in the United States.

[5] The Court may take judicial notice of the law of the State of habitual residence of the child in ascertaining whether there has been a wrongful retention within the meaning of Article 3 of the Hague Convention. See Hague Convention, at Art. 14.

Children. See Hague Convention, at Art. 3 (rights of custody may arise "by operation of law"). Pursuant to law and with Respondent's apparent consent, Ms. McManus was exercising her parental rights up until the time the McManus Children were retained in the United States. It is undisputed that Ms. McManus was living with, caring for, and schooling the children until they left for their vacation in the United States in July of 2003. Any argument that Respondent may make to challenge the adequacy of Ms. McManus's care during this time is not a basis for invalidating the exercise of custody rights. See Friedrich v. Friedrich, 78 F.3d 1060, 1065 (6th Cir. 1996) ("if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.")

## II.    Respondent Did Not Prove The Applicability of Any Exceptions To the Requirement That the McManus Children Be Returned to Northern Ireland.

The Hague Convention establishes a strong presumption favoring return of a wrongfully removed child. Danaipour v. McLarey, 286 F.3d 1, 13 (1st Cir. 2002). Accordingly, the exceptions to the rule of mandatory return iterated by the Convention are to be construed narrowly. Id.; see also Friedrich, 78 F.3d at 1067. The exceptions set forth in Article 13(b) of the Convention may not be used as "a vehicle to litigate (or relitigate) the child's best interests." Danaipour, 286 F.3d at 14, citing to Hague International Child Abduction Convention: Text