and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Dept. of State March 26, 1986) (hereinafter "Dept. of State Legal Analysis").

Even if a party proves the applicability of an exception, the court retains the discretion to order a child's return if doing so would further the aims of the Convention. Friedrich, 78 F.3d at 1067, citing Feder, 63 F.3d at 226.

**A.    Respondent Did Not Prove By A Preponderance of the Evidence That Ms. McManus Consented or Acquiesced To the Retention of the McManus Children In The United States.**

Respondent's retention of the McManus Children in the United States since July 21, 2003 has been done without the consent of Ms. McManus.  No evidence was presented by Respondent that he sought the permission of Ms. McManus to keep the children in the United States beyond their three week vacation.  In fact, the tape of Respondent's voicemail messages to Ms. McManus on July 21 and 23, 2003 shows that Respondent merely informed Ms. McManus of his unilateral decision to raise the children in the United States.  (Tr. 2, at p. 135, Exh. 21)

After being apprised of Respondent's decision, Ms. McManus did not subsequently ratify or acquiesce to Respondent's retention of the children.  She never told the children or Respondent that the children could remain in the United States.  (Tr. 2, at pp. 55, 135-36)  In fact, Ms. McManus's objection to Respondent's retention was made known soon after the Respondent's phone messages were left. The trial record shows that she took immediate legal action and had filed an application for the return of her children pursuant to the Hague Convention by

October 3, 2003. (Id., at pp. 38-39 and Exh. 22)  The instant petition, filed within 9 months of the retention, is an extension of the process initiated by that application.

Respondent made much of the fact that Ms. McManus was not intimately involved in Respondent's U.S. divorce proceedings in the Massachusetts Family and Probate Court. Ms. McManus has not waived any rights by foregoing participation in the pre-judgment proceedings in that action. First, the initial order of temporary custody, issued in July 21, 2004, was awarded ex-parte. Second, the Massachusetts Family and Probate Court had no jurisdiction over Ms. McManus, a resident of Northern Ireland living in Northern Ireland, at the time the divorce judgment was rendered. As such, the judgment would have and has no effect on Ms. McManus's custody rights as defined by Irish law. Third, Ms. McManus specifically objected to the entry of the divorce judgment, stating that the award of temporary custody was obtained upon erroneous facts. (Tr. 2, at Exh. 23)

More importantly, it is inappropriate for Respondent to suggest that this order should be dispositive or somehow defeat the children's return if otherwise appropriate. Article 17 of the Convention provides that a court may not refuse return on the basis of a court order awarding custody to the alleged wrongdoer. Indeed, "the Convention takes precedence over decrees made in favor of abductors before the court had notice of the wrongful removal or retention." State Dept. Legal Analysis, 51 Fed. R. 10494.

Respondent also inquired on cross-examination of Ms. McManus whether she had instituted in custody proceedings in Northern Ireland. The fact that her

answer was in the negative does not show acceptance of Respondent's asserted custody. See Whallon, 230 F.3d at 461 (ruling that Hague petitioner's failure to initiate formal custody proceedings "does not itself constitute acquiescence.")

For the above reasons, Respondent has failed to show any consent or acquiescence to Respondent's retention of the McManus Children in the United States.

**B.    Respondent Did Not Prove By Clear and Convincing Evidence That The McManus Children Will Suffer A Grave Risk Of Physical or Psychological Harm If They Are Returned To Ms. McManus In Northern Ireland.**

Respondent has asserted per Article 13(b) of the Convention that the McManus Children would suffer a grave risk of physical or psychological harm or be placed in an intolerable situation if they were to be returned to their mother in Northern Ireland. Respondent must establish that the alleged harm is "a *great deal more* than minimal." Whallon, 230 F.3d at 459 (emphasis supplied). As noted above, Respondent must demonstrate such harm by clear and convincing evidence.

The Court must make subsidiary factual findings to determine the nature and extent of any risk asserted by the respondent as a defense to the return of the children. Hasan, 2004 WL 57073 at *3 (D. Mass.). In evaluating the sufficiency of the evidence presented, a court "is not to engage in a custody determination or the address such questions as who would be the better parent in the long run." Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000).

In this case, a guardian *ad litem*, Dr. Sharon Gordetsky, was appointed by

the court to opine on, among other things, any risk of harm the McManus Children might face if returned to Northern Ireland. She testified at trial that the McManus Children were exposed to "situations" that put them at "a *serious* risk for current and future psychological harm." (Tr. 1, at p. 66)  Proof of "serious" risk will not defeat mandatory return under the Hague Convention. [6]  See State Dept. Legal Analysis, 51 Fed. Reg. at 10,510 ("The person opposing the child's return must show that the risk to the child is grave, not merely serious.")  Furthermore, the "situations" referenced by Dr. Gordestsky do not provide a credible basis on which to support her opinion that the children would be subject to serious harm by Ms. McManus. These situations primarily centered on: 1) reported incidents involving physical discipline of the children by third-parties; and 2) general chaos in the McManus home in Northern Ireland.

It is undisputed that the acts of physical discipline described by the children and recited by Dr. Gordetsky occurred on only two occasions and were directed at only two of the four McManus Children – Daniel and Sean. On both occasions, a third-party male came to the house in response to some act of misbehavior by the male children. One incident involved Sean and Peter who had refused to go to school and locked themselves in a bedroom. A neighbor, Graham, forced open the door, physically disciplined Sean, and instructed both to get ready for school. Peter Og admits that he was not touched by Graham and even questions whether Sean

---

[6]    It does not appear that Dr. Gordetsky consulted any literature, studies, or cases in assessing risk of harm within the meaning of the Hague Convention. In fact, Dr. Gordetsky declined specifically to opine on the question of grave risk and instead rendered an opinion based on a "child mental health perspective." See Exh. 2, at p. 43.

was struck at all. (Tr. 2, at p. 102: "I don't think he did anything to him. He [Graham] just like talked to him really mad and everything.")

The second incident was precipitated by Daniel who was admittedly acting up and refusing to listen to his mom. (Tr.2, at pp. 63-64) In response, Ms. McManus's brother Liam physically disciplined Daniel. No mark was left on either boy during either incident and the discipline was never repeated. (Tr. 2, at pp. 33, 76, 103) Ms. McManus testified that she would not allow this to happen in the future, a promise corroborated by Dr. Gordetsky. (Tr. 1, at p. 76; Tr.2, at p. 43) Given the infrequency and lack of severity of the physical discipline complained of and the absence of any credible evidence of any direct physical abuse by Ms. McManus,[7] this evidence does not rise to the level of clear and convincing evidence of grave risk of future physical abuse. See Whallon 230 F.3d at 460 (rejecting risk of harm defense on grounds that respondent presented no evidence of direct physical abuse by father); Hasan, supra (same).

Dr. Gordetsky's also premises her opinion on potential risk on what she describes as a "chaotic" environment in the home in Northern Ireland. While she attributes this primarily to alleged drinking of alcohol by Ms. McManus, she also admits that the evidence is "inconsistent" and she "does not know" whether Ms. McManus had or has a drinking problem. (Tr. 1, at pp. 68, 69) Indeed, Ms. McManus tested negative for alcohol during three random tests this past summer

---

[7]    Although the McManus Children testified that they had been hit by Ms. McManus growing up, there is no evidence that such acts rose to the level of physical abuse or were done other than to discipline the children. Stephanie's testimony in particular is inconsistent with her statement to Dr. Gordetsky that she had never been hit. (Tr. 1, at Exh. 2, p.45) Moreover, Dr. Gordetsky's opinion regarding future risk of harm focuses on the physical discipline exercised by Liam and Graham, not Ms. McManus.

(Tr. 2, at pp. 42-43) and none of the children could say that they had actually seen Ms. McManus drinking alcohol. Dr. Gordetsky confesses that she could not be sure from the children's stories whether Ms. McManus drinking consisted of one, two, or 12 beers. (Tr. 1, at p. 93) The most concrete of the children's stories is of numerous empty beer cans left on the kitchen table one morning. This alleged "viewing" however was never connected by the McManus Children to any act of unusual behavior or abuse towards the children by Ms. McManus.

Dr. Gordetsky also admits that the problems the McManus Children were having in Northern Ireland were "multi-determined" and, therefore, not necessarily driven by or as a result of the actions of Ms. McManus. (Id., at p. 68) Dr. Gordetsky testified that the children were "caught in an injurious parental battle," and suffered from 11 years of their parent's marital discord. (Id., at pp. 32, 77, 109) She also noted that the family dysfunction was fueled by Respondent's "parenting limitations" and "neglect" of his children's needs (Id., at pp. 58-60).

Although she acknowledged the contribution of the parents' marital problems and the Respondent's limitations to the children's emotional and behavioral issues, Dr. Gordetsky just scratched the surface. She admitted that she never inquired into the marital relations between the parents. (Id., at p. 106-7). Nor did she explore the issue of spousal abuse despite Ms. McManus's reported incidents of physical abuse by Respondent. Such inquiries into the precise source of the family

dysfunction should have been made in order to properly assess the children's risk of harm if they are returned.[8]

Reflective of the complexity of the children's problems, the chaos continues to play out in the United States. Daniel has attended a total of five different schools within a one year period. (Tr. 2, at pp. 66-67) At one point, his reluctance to follow through with school attendance was so severe that Respondent was forced to seek court intervention. (Tr. 1, at pp. 50, 62-63) Last school year, Stephanie's failure to attend school landed her in court in a similar action instituted by her school.[9] (Tr. 2, at pp. 118-119) And, as of the date of the trial, Sean had refused to go to school all together and was in the process of interviewing for admission at a new school. (Id., at pp. 74-75) Not surprisingly, Dr. Gordetsky testified that children would have to undergo counseling "on either side of the ocean." (Tr. 1, at p. 85)

Finally, the type of harm that Dr. Gordetsky claims the McManus Children would suffer is not, as a matter of law, recognized as sufficiently serious to defeat a return order. Dr. Gordetsky states that the children "would be very, very anxious

---

[8]    Dr. Gordetsky's methodology, perhaps indicative of her experience with state court custody cases, appeared more driven by determining the best interests of the McManus Children. For example, she emphasized that the children seemed to have a stronger emotional bond to their father than to Ms. McManus and that Ms. McManus was not capable of listening to, validating the feelings of, or exercising control over her children. (Tr. 1, at pp. 24, 28, 30, 44) These observations are irrelevant to assessing risk under Article 13(b). See Friedrich, 78 F.3d at 1068 ("The exception for grave harm to the child is not license for a court to speculate on where the child would be most happiest. That decision is a custody matter, and reserved to the court of the country of habitual residence.) See also U.S. Dept. of Justice, Juvenile Justice Bulletin (Dec. 2001) at p. 2 ("A Hague Convention case is not about the 'best interests of the child' but rather is about returning the child to the jurisdiction that should hear the custody matter.")

[9]    Both Stephanie and Daniel were required to participate in a CHINS ("Child in Need of Services") action for their failure to attend school. A Child In Need of Services is "a child below the age of seventeen who persistently runs away from the home of his parents or legal guardian, or persistently refuses to obey the lawful and reasonable commands of his parents or legal guardian, thereby resulting in said parent's or guardian's inability to adequately care for and protect said child, or a child between the ages of six and sixteen who persistently and wilfully fails to attend school or persistently violates the lawful and reasonable regulations of his school." See Exh. 4, at Mass. G. L. 119 § 21.

about losing their relationship with their father" and their paternal relatives of whom the children "have become quite fond." (Tr. 1, at p. 84) They would also feel "betrayed," "depressed" and "angry" that they were "were not listened to" and "not believed." (Id., at pp. 82-83) All of these alleged harms relate to short-term adjustment problems that would inevitably result from repatriation to Northern Ireland.   This is not the type of serious risk of harm to against which the Convention is designed to protect.  See Antunez-Fernandes v. Connors-Fernandez, 259 F. Supp.2d 800 (N.D. Ia. 2003) ("The disruption of the usual sense of attachment that arises during most long stays in a single place with a single parent should not be considered a grave risk of harm for the purposes of the Convention."); Gonzalez, supra (no grave risk of harm where repatriation causes inconvenience or hardship to a child or is inconsistent with a child's preferences); Friedrich, 78 F.3d at 1067-68 (respondent's expert testimony that a child's repatriation to Germany would be traumatic and difficult for the child did not rise to the level of seriousness needed to establish grave risk).

Based on the above, the Respondent has not produced clear and convincing evidence that the McManus Children will suffer grave risk of harm if they are returned to Northern Ireland.

### a.    The Court Can Return The McManus Children To Northern Ireland On Condition That Ms. McManus Perform Certain Undertakings.

A federal court retains, and should use when appropriate, the discretion to

27

return a child to her place of habitual residence, despite the existence of a defense, if the return would further the aims of the Convention. Friedrich, 78 F.3d at 1067. Such an appropriate circumstance is present where the petitioning parent promises certain undertakings designed to alleviate specific dangers that might otherwise justify denial of the return petition. See P.R. Beaumont & P.E. McEleavy, The Hague Convention on International Child Abduction 156-59 & n. 183 (concept of "undertakings" is not used in the Hague Convention or ICARA; rather, it is a judicial construct developed by British family courts); Blondin v. Dubois, 238 F.3d 153, 159-60, fn 8 (2nd Cir. 2001) (noting increasing use of undertakings by federal courts); Walsh, 221 F.3d at 219 ("Given the strong presumption that a child should be returned, many courts, both here and in other countries, have determined that the reception of undertakings best allows the achievement of the goals set out in the Convention while, at the same time, protecting children from exposure to grave risk of harm.")

At the core of Respondent's risk of harm defense is his claim that Ms. McManus's drinking poses a threat to the McManus Children and other third-parties have physically disciplined the twins. As argued above, the data presented at trial on the issue of Ms. McManus's alleged alcoholism was inconclusive. Nor has Respondent demonstrated that the physical discipline of the twins arose to a level of physical abuse or that there is a likelihood of it being repeated in the future. Nevertheless, Ms. McManus testified that she would be willing to do the following if her children were returned to Northern Ireland: 1) stop drinking and undergo

28

further alcohol testing; 2) undergo family counseling at facilities in Northern Ireland such as Women's Aid or the Aisling Center; and 3) obtain third-party intervention, if needed, from professionals rather than family or neighbors. (Tr. 2, at p. 43) Thus, even if the Court finds that Respondent has proved grave risk of harm by clear and convincing evidence, it may still order the return of the McManus Children on the condition that Ms. McManus undertake such actions pending a custody determination in Northern Ireland. This would fulfill the Convention's preference for a prompt return while denying Respondent any advantage gained by the abduction of the McManus Children.

**C. Respondent Did Not Prove By a Preponderance of The Evidence That the McManus Children Object To Returning to Northern Ireland And That They Are Of Sufficient Age and Maturity Such That Their Views Should Be Considered By This Court.**

Respondent's third Article 13 defense to the mandatory return of the McManus Children is that the McManus Children object to being returned to Northern Ireland and are of sufficient age and maturity such that their views should be considered by this Court. Respondent must establish the children's objection and maturity by a preponderance of the evidence. This he has failed to do.

At trial, Respondent offered the testimony of Dr. Gordetsky and the four McManus Children. The most this testimony proved is that the McManus Children, as of the date of the trial, merely *prefer* to stay in the United States. Moreover, the evidence clearly shows that their preference is far from absolute.

With respect to Daniel, Dr. Gordetsky testified specifically that Daniel did *not* have an objection to returning to Northern Ireland and that he merely "desired" to say in the United States. (Tr.1, at p. 19) Although he later testified that he in fact did object to returning, Daniel admitted to "begging" to go back to Northern Ireland last January because "it wasn't going so good" in America. (Tr. 2, at pp. 64-65) Even Respondent admitted that Daniel had made such demands over a two month time period. (Tr. 2, at p. 126)  In addition, the testimony demonstrated that Daniel identifies positively with the school he attended, the football teams he was on, and his friends in Northern Ireland and is proud to be half-Irish. (Tr. 1, at p. 21; Tr.2, at pp. 62, 65)

Sean has similarly vacillated as to where he would like to live. As with Daniel, Dr. Gordetsky testified that Sean merely "desired" to stay in America. (Tr.1, at p. 22)  During his testimony, Sean reiterated his desire but simultaneously acknowledged that he had expressed a wish earlier in the summer to return with his mother to Northern Ireland. (Tr. 2, at pp. 71, 74, 76)  Like Daniel, Sean conveyed strong feelings for his school and friends in Northern Ireland and specifically admitted that he wished that the St. Michael's College in Enniskillen "was in America." (Id., at p.78)

The two youngest children, Stephanie and Peter Og, also stated that they would "rather" stay in the United States. (Tr. 2, at pp. 81, 93) Peter Og, however, stated a desire to go to Northern Ireland to see his mom.  Peter Og testified that he

missed his Irish friends and Stephanie, her Irish cat, "Kitty-Mitty." (Id., at pp. 87, 100-01)

A child's "preference" as to where she would like to live is not synonymous with a child's "objection" to being returned to a particular place. This is particularly so where the preference has been demonstrated, as in the case of Daniel and Sean, to be inconsistent or where it may be the result of being wooed by the Respondent.[10] While the McManus Children's desires and wishes are certainly significant in any future custody determination in which the best interests of the children are to be considered, this information is a "non-sequitor" for purposes of the instant Hague Petition case. See England v. England, 234 F.3d 268, 272 (5th Cir. 2000) (finding 13 year old girl's preference to stay in the United States does not satisfy burden of establishing objection defense under Article 13).

Even if a preference were deemed sufficient to sustain the Respondent's burden to prove an objection, the McManus Children are simply not mature enough to select their residence. Notwithstanding Dr. Gordestsky's conclusion that the children are capable of "independent opinions" and "understanding ambivalence" (Tr. 1, at pp. 19), other testimonial evidence presented over the course of the trial demonstrates that they are not able to make definitive and appropriate decisions about their future.

---

[10]    Respondent testified that this summer he had purchased Stephanie a new kitten because she missed her kitty in Ireland, and enrolled Peter Og for the first time in camp and sailing lessons. (Tr. 2, at pp. 136-138). It is at least plausible that Respondent did these things in order to influence his children's feelings on their place of ultimate residence. The same could be said of Respondent's willingness to shop for schools for Sean. (Id., at pp. 126-27) These actions should be taken into consideration by the Court in determining the maturity of the children. See Sheikh v. Cahill, 546 N.Y.S.2d 517, 521-22 (NY Supr. Ct. 1989) (wherein court deemed 9 year old boy was not mature enough to express a preference regarding residence because boy's expressed preference to stay in the U.S. was as a result of being wooed by respondent during a summer vacation).

The confusion over where they feel comfortable living is apparent in the twins' vacillation between living in America and returning to Northern Ireland. See Tr. 1, at p. 21 (where Dr. Gordetsky recites one collateral contact's description of Daniel as "confused and lost") The three oldest of the group are apparently not even capable of deciding what schools they like would like to attend or whether they want to attend school at all. The children's behavioral issues, serial absenteeism from school, and changing desires are understandable given the disruption in the last 3 years of their young lives caused by living in two different countries, attending multiple schools (the most being 7 schools for Daniel), enduring a lifetime of marital disharmony, and participating in this Court proceeding. They are not, however, a solid basis from which this Court can conclude that they are sufficiently mature. Thus, to the extent that the Court considers their views at all, they should be viewed in their proper context.

**III.    Petitioner is Entitled to Reimbursement of Her Reasonable Costs If This Court Orders The Return of The McManus Children To Northern Ireland.**

The ICARA mandates the payment of fees and costs in an action where the court orders a child's return. It provides in relevant part:

> Any court *ordering the return of a child* pursuant to an action brought under section of this title *shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner*, including court costs, legal fees, foster home or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

32

42 U.S.C. § 11607(b)(3) (emphasis supplied).  This section of the ICARA is

interpreted broadly to better serve the Convention's deterrent objective.  See Hasan,

2004 WL 57073 at *4.  If the Court finds that Respondent wrongfully retained the

McManus Children and orders their return to Northern Ireland, then Ms. McManus

is entitled to her reasonable expenses, as will be itemized in a separate motion.


## CONCLUSION

For the above stated reasons,  Petitioner Dympna D. McManus requests that

this Court grant her petition, order the return of Daniel, Sean, Stephanie, and Peter

McManus to Northern Ireland, and grant her reasonable costs.


DYMPNA D. MCMANUS
By her Attorneys,

HOLLAND & KNIGHT, LLP

David J. Correira, Esq. (BBO #554520)
Jennifer Cervenka, Esq.(BBO #645724)
HOLLAND & KNIGHT LLP
One Financial Plaza, Ste. 1800
Providence, RI 02903
Tel:  401-751-8500
Fax: 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

33

CERTIFICATION

I hereby certify that on the 12th day of November, 2004, I sent a copy of the

within document by first class mail to:

Harold Robertson, Esq.
Harmon & Robertson, P.C.
85 Merrimac St. 4th Floor
Boston, MA  02114

*Paula K Gordon*

# 2390500 v1