UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10752-GAO

DYMPNA D. MCMANUS,
Petitioner

v.

PETER J. MCMANUS,
Respondent

MEMORANDUM AND ORDER
February 4, 2005

O'TOOLE, D.J.

The petitioner brought this action seeking the return of her four minor children to Northern Ireland pursuant to the 1980 Hague Convention on the Civil Aspects of International Child Abduction ("Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, and its implementing statute, the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610. Upon consideration of the evidence adduced at a two-day trial without a jury and the parties' submissions, I conclude that the petition ought to be denied and the return of the children to Northern Ireland refused. In support of that conclusion, I make the following findings of fact and rulings of law:

I.  **Findings of fact**

The petitioner, Dympna McManus, a citizen of Northern Ireland, and the respondent, Peter McManus, a citizen of the United States, were married in Massachusetts in 1988 and again in a religious ceremony in Northern Ireland in 1989. They have had four children: Daniel and Sean are

fourteen-year-old twins, Stephanie is thirteen, and Peter is eleven.[1] The children were all born in the United States and are U.S. citizens.

The family lived together in Massachusetts until May 2001, at which time they relocated to Northern Ireland where Dympna's extended family lived. When they relocated, they sold their house and cars in Massachusetts and shipped their furniture and personal belongings to Northern Ireland. After arriving in Northern Ireland, they rented a house, purchased a car, and applied for government-provided health insurance. Peter did not have a job in Northern Ireland. The children attended school there and participated in numerous school and social activities.

Peter and Dympna's marriage was troubled for some years prior to the move to Northern Ireland. It was marked by poor communication, altercations, and estrangement. After the move, their relationship did not improve, and in December 2001, Peter returned alone to Massachusetts. Dympna and the four children remained in Northern Ireland. Peter visited the children a few times during 2002, and each time he returned alone to Massachusetts. He commenced divorce proceedings in the Massachusetts probate and family court in early 2003.

In July 2003, the children, with Dympna's consent, traveled to Massachusetts for what was to be a three-week visit with their father. They traveled with round-trip plane tickets and were scheduled to return to Northern Ireland on July 24, 2003. While visiting Peter, the children disclosed the unpleasant details of their living conditions in Northern Ireland. For example, the children had grown unruly and disobedient in Dympna's care, and she drank alcohol regularly to excess, which interfered with her ability to care for and control the children. The children testified that on several

---

[1] The parties' son Peter is often referred to by family members, particularly by his mother, as Peter Óg (Irish for "young Peter") to distinguish him from his father. For clarity, I will follow that convention here. "Peter" refers to the father, "Peter Óg" to the son.

occasions Dympna struck them or threw objects at them. On at least two occasions, Dympna summoned her brother, Liam, and a neighbor, Graham, to help discipline the children. Liam and Graham struck at least two of the children. As it was described at trial, the household had become chaotic, and the children were quite unhappy.

After hearing of these conditions, Peter decided to keep the children in Massachusetts. He left two messages on Dympna's answering machine telling her that the children would not return to Northern Ireland as had been previously scheduled. Peter and Dympna did not speak about Peter's decision to keep the children. Dympna consulted a solicitor in Northern Ireland for advice about how to secure the return of the children, but aside from filing an application under the Convention with the proper authorities in Northern Ireland, she did not seek any relief from the courts of Northern Ireland or the United States. In December 2003, Peter obtained a divorce judgment from the Massachusetts probate and family court, including a grant of temporary custody of the children. Dympna filed the present petition under the Convention in April 2004.

II. **Rulings of law**

    A. **Legal framework**

The Convention was adopted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Convention, T.I.A.S. No. 11,670, at 7. The Convention's remedial scheme is designed "to restore the pre-removal status quo and discourage a parent from crossing international borders in search of a more sympathetic forum." Whallon v. Lynn, 230 F.3d 450, 455 (1st Cir. 2000). It "seeks to deter those who would undertake such abductions by eliminating their primary motivation for doing so. Since the goal of the abductor generally is to obtain a right of

custody from the authorities of the country to which the child has been taken, the signatories to the Convention have agreed to deprive his actions of any practical or juridical consequences." Mozes v. Mozes, 239 F.3d 1067, 1070 (9th Cir. 2001) (citations and internal quotations omitted). To achieve its goals, the Convention requires that "children who have been wrongfully removed from their country of habitual residence must be returned, unless the abductor can prove one of the defenses allowed by the Convention." Danaipour v. McLarey, 286 F.3d 1, 13 (1st Cir. 2002).

Under ICARA, a petitioner seeking the return of a child must establish by a preponderance of the evidence that the child has been wrongfully removed or retained within the meaning of the convention. 42 U.S.C. § 11603(e)(1). Under Article 3 of the Convention,

> The removal or retention of a child is to be considered wrongful where–
>
>    (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
>    (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, art. 3, T.I.A.S. No. 11,670, at 9. If the petitioner demonstrates that a child has been wrongfully retained, then the court must order the prompt return to the child's state of habitual residence, unless the respondent demonstrates that one of the exceptions expressed in Article 13 or Article 20 applies. 42 U.S.C. § 11601(a)(4); Whallon, 230 F.3d at 454.

    B.    **Wrongful retention**

To prove that Peter's retention of the children in Massachusetts in July 2003 was wrongful, Dympna must prove that at the time of the retention Northern Ireland was the children's place of habitual residence and that she had been and was exercising custody rights in Northern Ireland.

Neither the Convention nor ICARA defines the term "habitual residence." It has been left to the courts to develop a working definition. The Third Circuit has defined it this way:

> [W]e believe that a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective. We further believe that a determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there.

Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995).[2] To establish an habitual residence, it is not necessary to have an intention to stay in the place indefinitely. Id. at 223.

The Ninth Circuit, in a case where a child had a clearly established habitual residence in the native country of one parent and then took up residence in the native country of the other parent, found:

> When a child has no clearly established habitual residence elsewhere, it may become habitually resident even in a place where it was intended to live only for a limited time. The same is true if the child's prior habitual residence has been effectively abandoned by the shared intent of the parents. Where there is no such intent, however, a prior habitual residence should be deemed supplanted only where 'the objective facts point unequivocally' to this conclusion.

Mozes, 239 F.3d at 1082 (footnote and citation omitted).

Applying those principles here, I conclude that Northern Ireland was the children's place of habitual residence in July 2003 when Peter retained them in Massachusetts. It is clear that prior to May 2001 (when the family moved to Northern Ireland) their habitual residence was in Massachusetts; in fact, it was the only place where they had lived. Nevertheless, the evidence at trial demonstrated that when they moved to Northern Ireland in May 2001 the parents had decided to

---

[2] The First Circuit has favorably cited this formulation in an unpublished, non-precedential decision. See Zucker v. Andrews, 181 F.3d 81 (1st Cir. 1999)(unpublished table decision).

leave Massachusetts for at least the near foreseeable future and to make their home for an indefinite time in Northern Ireland. While the parents had not reached an agreement on how long they would stay in Northern Ireland, they nevertheless had no plans to return to the United States.

During the two years that they lived in Northern Ireland, the children became settled and acclimated to their new location. They enrolled in and attended schools, joined organized sports teams, participated in church activities, and engaged in other activities as residents of the country would.

Peter does not dispute the extent to which the children had become settled and acclimated in Northern Ireland and were participating in academic, civic, and family life there. Further, he does not suggest that he or Dympna had any plans to move the children away from Northern Ireland at the time they visited him in July 2003. On the contrary, he acknowledges that the children had round-trip plane tickets and were scheduled to return to Northern Ireland after a three-week stay in Massachusetts. It was only after they arrived in Massachusetts and he learned of the circumstances in Northern Ireland that Peter decided to retain the children here.

On the basis of this evidence, I find by a preponderance of the evidence that at the time the children visited their father in July 2003, Northern Ireland was their place of habitual residence as that concept is employed in the Convention.

The second proposition that Dympna must establish in order to show that the retention of the children in the United States was wrongful is that she was at the time exercising custody rights granted her under the laws of Northern Ireland. This proposition is not contested by Peter, for good reason. The undisputed evidence establishes that Dympna had physical custody of the children in

Northern Ireland and was solely responsible for their care (except for financial assistance from Peter) for approximately eighteen months after Peter left Northern Ireland and returned to Massachusetts.[3]

Accordingly, because Northern Ireland was the children's place of habitual residence and Dympna had and was exercising custody rights prior to their trip to Massachusetts in July 2003, the conclusion follows that Peter's retention of the children in Massachusetts was wrongful within the meaning of the Convention.

C. **Exceptions**

Peter asserts that, notwithstanding his wrongful retention, there are two exceptions to the Convention's rule of summary return that apply and should persuade me to deny the petition for the return of the children to Northern Ireland. Invoking Article 13(b) of the Convention, he argues that "there is a grave risk that" return of the children would expose them "to physical or psychological harm or otherwise place [them] in an intolerable situation." Convention, art. 13, T.I.A.S. No. 11,670, at 15. He also invokes a second Article 13 exception that provides, "The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Id.

---

[3] Peter's post-retention application for a custody decree from the Massachusetts probate court is immaterial to a proper consideration, pursuant to the Convention, of the wrongfulness of the retention. See Whallon, 230 F.3d at 459 ("The pending Massachusetts custody proceedings commenced by [the respondent] after her removal of [the child] are inapplicable to this action because the Convention refers specifically to [the petitioner's] rights of custody at 'the time of removal.'")(citation omitted).

"The Convention establishes a strong presumption favoring return of a wrongfully removed child," and "[e]xceptions to the general rule of expedient return . . . are to be construed narrowly." Danaipour, 286 F.3d at 13-14 (citations omitted). The party opposing return of a child has the burden of proving the Article 13(b) "grave risk" exception by clear and convincing evidence; the applicability of other Article 13 exceptions, including the "objection" exception, need only be proved by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2). The Court has discretion to order the return of a wrongfully retained child even if the conditions for an exception are met. Danaipour, 286 F.3d at 14.

1. **Grave risk of harm**

To sustain the burden under the Article 13(b) exception, Peter must show that, if the children are returned, the risk of physical and psychological harm is "grave," which is said to be "a great deal more than minimal," Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000), and "more than serious," Danaipour, 286 F.3d at 14. The First Circuit has explained:

> The text of the article requires only that the harm be 'physical or psychological,' but context makes it clear that the harm must be a great deal more than minimal. Not any harm will do nor may the level of risk of harm be low. The risk must be 'grave,' and when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention. For example, the harm must be 'something greater than would normally be expected on taking a child away from one parent and passing him to another'; otherwise, the goals of the Convention could be easily circumvented.

Walsh, 221 F.3d at 218 (citations omitted).

The First Circuit has also cautioned that "[t]he Article 13(b) defense may not be used 'as a vehicle to litigate (or relitigate) the child's best interests.'" Danaipour, 286 F.3d at 14 (citation omitted). Thus, in determining whether the petition for return ought to be granted, the task is not

simply to determine where the child would be happiest or who would be the better parent. Walsh, 221 F.3d at 218; see also Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996). The Convention is designed to ensure that those and other issues underlying the custody dispute are presumptively to be adjudicated in the place of the child's habitual residence.

Further, a grave risk of harm is not "established by the mere fact that removal would unsettle the children who have now settled in the United States. That is an inevitable consequence of removal." Walsh, 221 F.3d at 220 n.14. "A removing parent must not be allowed to abduct a child and then – when brought to court – complain that the child has grown used to the surroundings to which they were abducted. Under the logic of the Convention, it is the *abduction* that causes the pangs of subsequent return." Friedrich, 78 F.3d at 1068 (footnote omitted).

Applying those principles and considering all the circumstances of this case, I am not persuaded to the degree required that the children will be exposed to a grave risk of physical or psychological harm, or a situation that is otherwise "intolerable," if returned to Northern Ireland.

Prior to trial, I appointed a guardian ad litem, Dr. Sharon Gordetsky, a clinical psychologist with a specialty in children and families, to assess the risk of physical or psychological harm if the children were to be returned to Northern Ireland, and also to assess their degree of maturity and to determine the wishes of the children with respect to their being returned to Northern Ireland. Dr. Gordetsky prepared a comprehensive report and testified at trial.[4]

The children had described to Dr. Gordetsky (as they had previously to a social worker in the probate court) that Dympna drank to excess on a regular basis, and that her drinking contributed to the bleak environment at the home in Northern Ireland. The children gave similar testimony in the

---

[4] Dr. Gordetsky's was the only expert evidence offered at trial.

trial. Dympna sometimes physically disciplined the children, and she solicited the assistance of her brother and a neighbor to physically discipline the children. There were two incidents described in the testimony that involved physical or violent discipline. In one incident, Dympna's brother Liam was said to have broken through a locked bathroom door and forcibly removed Daniel, striking him as he did so. In the other, the friend, Graham, was said to have slapped Sean on the head with the palm of his hand. There was no testimony about specific instances of physical violence directed at either Stephanie or Peter Óg. There was also general testimony about Dympna's striking the children and throwing household objects, but no specific instances were described. It is clear from the evidence that the children had grown troubled and fearful from the chaotic conditions and physical discipline to which they were subjected.

Dr. Gordetsky ultimately concluded in her written report that the children "were frequently exposed to situations that put them at serious risk for current and future psychological harm. Further, the children presented credible narratives that from a child's mental health perspective would constitute an intolerable situation." In reaching those conclusions, Dr. Gordetsky noted that the children had endured physical altercations with their mother, her brother, and her friend and that the home had deteriorated to a state of physical and emotional dysfunction and chaos. The relationship between Dympna and the children had become quite strained and has deteriorated further since they have been in the United States. Dr. Gordetsky testified that if returned to Northern Ireland the children would likely experience depression, anger, anxiety, shame, and betrayal.

I find that the children have been subjected to physical discipline and psychological distress while in their mother's care in Northern Ireland. I also find that, regardless of whether they stay in Massachusetts or return to Northern Ireland, they will likely continue to suffer some degree of

10

psychological harm as a result of their parents' marital and parenting problems. I do not doubt Dr. Gordetsky's prognosis of continuing disruption and some level of consequent psychological harm if they were to be returned to Northern Ireland, especially in light of their own objections. See infra pp. 12-15. The harm they have suffered and likely will suffer is not to be minimized and can certainly be characterized as "serious." However, in this circuit, at least, a "serious" risk of harm, short of a "grave" risk, does not rise to the level of prospective harm that the Article 13(b) exception recognizes as a reason for not returning a wrongfully removed or retained child. See Danaipour, 286 F.3d at 14.

Cases that have approved invocation of the Article 13(b) exception have focused on evidence of a sustained pattern of physical abuse and/or a propensity for violent abuse. See, e.g., Walsh, 221 F.3d at 219-220 (finding grave risk of harm where petitioner had severely beaten his wife over a number of years, including while she was pregnant, many of the beatings took place in front of her small children, and petitioner had a history of other violent activity and of chronic disobedience of court orders); see also Danaipour v. McLarey, 386 F.3d 289 (1st Cir. 2004) (affirming district court finding of grave risk of psychological harm where petitioner had sexually abused one of the two children whose return was sought). Evidence of real but sporadic or isolated incidents of physical abuse, or of some limited incidents aimed at persons other than the child at issue, have not been found sufficient to support application of the "grave risk" exception. See Whallon, 230 F.3d at 460 (finding that allegations of physical and verbal abuse did not rise to the level needed to satisfy the Article 13(b) exception and stating that "[t]o conclude otherwise would risk substituting a best interest of the child

analysis for the analysis the Convention requires"). Guided by these principles, I conclude that the respondent has not established the existence of a "grave risk" by clear and convincing evidence.[5]

### 2. **The children object**

Peter also argues that I should take account of the children's own maturely formed objections to being returned to Northern Ireland and decline to order their return. In their trial testimony, each child expressed an objection to being returned to Northern Ireland. During their testimony, I observed the children to be intelligent, mature, and articulate. They displayed an appropriate understanding of and appreciation for the issues presented in this matter and effectively communicated their experiences and feelings concerning those issues. Among other reasons, the children testified that they do not respect their mother, she drinks too much, she fights with and hits them, and she had her brother and neighbor come to the house to discipline them. In contrast, the children testified that they preferred to remain in Massachusetts with their father because they have more respect for him, he does not drink, and he does not hit them. Generally, since July 2003, the children have become settled again at school and at home in Massachusetts, and they wish to remain in that environment. Their testimony appeared to represent their genuine thoughts and feelings; neither I nor Dr. Gordetsky (according to her) found indications that their testimony had been coached or otherwise unduly influenced by their father.

---

[5] Dympna testified at trial that Peter struck her on two occasions. Peter denied the allegations. Even assuming that Dympna's version of events is the correct one, it would not change the conclusion I reach in the following section. Peter's alleged violence appears isolated and remote in time, and importantly, was allegedly directed at Dympna and not the children who are the subject of the petition for return. The extent and target of the alleged violence is comparable to that described in Whallon, 230 F.3d at 460, and distinguishable from the pattern of severe violence described in Walsh, 221 F.3d at 209-212.

12

Dr. Gordetsky described in her report and testified at trial that she found each child to be cognitively and emotionally mature. She separately addressed for each child both the child's level of maturity and the substance of the child's objection to returning to Northern Ireland. She indicated that each child was capable of independent thought and was able to appropriately and effectively communicate his or her emotions and desires. Further, she found that each child demonstrated an appropriate appreciation for the implications of his or her expressed desire to remain in the United States, including a certain amount of ambivalence about the decision and its implications. She regarded the ambivalence as a sign of maturity, indicating an ability to weigh both sides of a question and an appreciation that decisions are not always "black-and-white."

With respect to Daniel and Sean, both 14, the judgment whether, under Article 13, to respect their objections is relatively easy. The Convention only applies to children who are under 16 years old, Convention, art. 4, T.I.A.S. No 11,670, at 5, and the authoritative commentary to the Convention suggests that children who are nearing 16 years should ordinarily have their own wishes respected. Elisa Pérez-Vera, Explanatory Report on the 1980 Child Abduction Convention, ¶ 30, at 433, in 3 Hague Conference on Private Int'l Law, Acts and Documents of the Fourteenth Session (1980), available at http://hcch.e-vision.nl/index_en.php?act=publications.details&pid=2779 ("[T]he fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will."). The application of the exception is not automatic either for 15-year-olds or, as here, 14-year-olds, but it can be applied with more confidence the older the child. I have no trouble concluding, based on the evidence and my direct observations, that Daniel and Sean have attained an age and maturity such that their views ought to be taken into

account. In my judgment, their objections to being returned to Ireland is thoughtfully and not reflexively reached and ought to be honored.

The decision regarding the objections of the younger two children, Stephanie and Peter Óg, is not as easy. Nevertheless, I place considerable reliance on Dr. Gordetsky's professional clinical assessment of them. Although recognizing that Stephanie and Peter Óg were not as mature as their older brothers, she nonetheless concluded that they were able to understand and appreciate the circumstances of the controversy concerning where they should reside and were similarly able to form and express a thoughtful opinion deserving of respect.

Additionally, Dr. Gordetsky noted that the four children were very close, in part having been pushed to band together by conditions in the home in Northern Ireland. With respect to Stephanie and Peter Óg, Dr. Gordetsky expressed the opinion that they would suffer some level of psychological harm if returned to Northern Ireland under any circumstances, and this would undoubtedly be exacerbated if they were ordered returned without Daniel and Sean. Thus, while the case for respecting the objections voiced by Stephanie and Peter Óg is not quite as strong as it is for Daniel and Sean, the additional factor of the psychological harm that the younger two would likely suffer if the children were separated gives support for the conclusion that they also should have their objections to return honored.

In the end, there are three possible choices: (1) return all the children to Northern Ireland, notwithstanding the validity of Daniel's and Sean's Article 13 objections; (2) honor Daniel's and Sean's objections and decline to order their return, but split the family and return the younger two whose objections may be somewhat less compelling; or (3) return none of the children, giving effect to Daniel's and Sean's objections and honoring Stephanie's and Peter Óg's objections as well on the

14

basis of the combined assessment of the soundness of the objections and the prospect of harm from their return without their older siblings. The last of these seems the most satisfactory as the best accommodation of the various factors to be taken account of under the Convention.

It may be objected that this is simply a "best interests of the child" analysis masquerading as a "mature child's objection" analysis. The answer to that objection is that while the former is forbidden in proceedings under the Convention, the latter is invited. The Convention clearly contemplates that the objections of a mature child should be taken account of and can be relied on to override the return that would otherwise be mandated. Obviously, there may be some overlap between the two inquiries. One can easily appreciate that giving effect to the mature objection may in any given case also be thought to be in the child's best interest. But that coincidence surely should not defeat application of the Article 13 "objection" exception. It would be absurd to conclude that the child's mature objection should be honored *unless* it is in the child's best interest.

Congress has added to the Convention's endorsement of the exception the codicil that the factual predicate for finding that a mature objection has been made need only be established by the customary civil action standard of a preponderance of the evidence. In contrast to the other exception argued for in this case, the prospect of a "grave risk" of physical or psychological harm to the child if returned, establishing the "objection" exception to return is not subject to a stringent burden of proof, and thus a court may more readily find a valid objection than it could find the existence of a grave risk. This difference in stringency of examination is expressly mandated by ICARA, 42 U.S.C. § 11603(e)(2). From this I conclude that the "objection" exception to a summary order of return is meant, both by the drafters and signers of the Convention and by Congress, to be used. Here, I find the conditions for its use satisfied.

III.    **Conclusion**

Though Peter's retention of the children was wrongful under the Convention, I exercise the discretion granted by Article 13 of the Convention to refuse Dympna's petition for the return of the children to Northern Ireland.[6]

It is SO ORDERED.

February 4, 2005                                    \s\ George A. O'Toole, Jr.
DATE                                                DISTRICT JUDGE

---

[6] This order resolves only those issues arising under the Convention; any issues of family law and rights of custody may be resolved in a court of proper jurisdiction in the appropriate venue.